**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

─────────────────────────

UNITED STATES OF AMERICA,

      Plaintiff,

  vs.                             No. 23-cr-749-WJ

EDWARD VALLEZ,

      Defendant.

**MEMORANDUM OPINION AND ORDER DENYING
DEFENDANT'S MOTION TO SUPPRESS**

**THIS MATTER** comes before the Court following a hearing on Defendant's Motion to Suppress (**Doc. 43**). Upon review of the parties' written pleadings, evidence presented, oral arguments, and applicable law, the Court finds Defendant's motion is not well taken and is therefore **DENIED**.

Defendant is charged in a single count Indictment (**Doc. 4**) with the felony crime of possession with intent to distribute fentanyl. Defendant's motion seeks suppression of large quantities of fentanyl (approximately 22,800 grams or 22.8 kilograms) and large sums of cash (approximately $130,000) seized during an inventory search of a white Dodge Ram sport utility vehicle ("SUV") allegedly driven by Defendant that crashed into a cinderblock wall in Bernalillo County, New Mexico, at approximately 11pm on February 9, 2023. At the suppression hearing, the Court heard the testimony of New Mexico State Police ("NMSP") patrol officer Lujan ("Officer Lujan") and NMSP Sergeant LaFave ("Sergeant LaFave"). At the conclusion of the witnesses' testimony, during argument, defense counsel conceded that the only remaining issue in

1

Defendant's suppression motion concerns the scope of the inventory search of the vehicle before it was towed.

Based on witness testimony and photographs taken at the crash scene, there is no dispute that the SUV was a total loss and could not be driven. The evidence established that the SUV—after crashing into a cinderblock wall, running over street signs, and knocking down a streetlight—came to rest partially in the median and partially blocking the left west bound lane of a four-lane public street. Moreover, there is no dispute that the SUV had to be towed so that the crash scene could be cleaned up and the public street reopened for vehicular travel. For the reasons that follow, the Court finds that the actions of the law enforcement officers responding to the events of February 9, 2023, resulted in no violation of Defendant's Fourth Amendment rights.

## BACKGROUND[1]

Officer Lujan was on duty and driving southbound on Interstate 25 in Albuquerque the night of February 9, 2023, when he observed the swerving SUV pass his patrol vehicle at a high rate of speed near the interchange between Interstate 25 and Interstate 40. Shortly thereafter, the SUV further accelerated—reaching a top speed of approximately 125 miles per hour where the posted speed limit is 65 miles per hour. After the SUV exited I-25 onto Avenida Cesar Chavez heading westbound, Officer Lujan activated his patrol vehicle's emergency lights which prompted the SUV to slow down. But then, as Officer Lujan's vehicle was preparing to stop, the SUV left at a high rate of speed heading west on Avenida Cesar Chavez.[2] Officer Lujan testified that a few moments later, he regained visual sight of the SUV near the intersection of Bridge Boulevard and

---

[1] The Court's findings set forth in the Background Section are based on the witness testimony and exhibits introduced at the Suppression Hearing—which are consistent with the factual narrative set forth in the United States' Response to Defendant's Motion to Suppress (**Doc. 46**).

[2] Avenida Cesar Chavez is a four-lane road in the City of Albuquerque running east/west. Westbound Avenida Cesar Chavez turns into Bridge Boulevard around the location where the road crosses the Rio Grande River. The SUV crashed near the intersection of Bridge Boulevard and La Vega Drive, just west of the Rio Grande River in Bernalillo County, New Mexico.

La Vega Drive. Officer Lujan testified that what he saw next was a "large cloud of dust"—as the SUV crashed into a cinderblock wall.







**Doc. 46-2 at 1 & 10**.

Once on scene, Officer Lujan immediately noticed "a large amount of U.S. currency" in plain view. The passenger side door of the vehicle was ripped off and money was visible inside and outside of the SUV.





**Doc. 46-6 at 8 & 9**. No one, however, was inside the SUV when Officer Lujan first approached the SUV. Instead, a nearby business owner was in the midst of detaining someone who fled the scene. Officers Lujan and Jara[3] then approached the business owner and male subject—who identified himself as the passenger. The passenger also identified the driver as "Edward." The passenger told law enforcement that both he and the driver were injured; however, the driver of the vehicle (Defendant) was not in the SUV or at the crash scene. Instead, "Edward," the Defendant, was located a quarter mile from the scene—where the Bernalillo County Sheriff's Office ("BCSO") deputy located him and returned him to the scene. At the suppression hearing, the NMSP officers testified that several BCSO deputies arrived to provide assistance with traffic and help secure the scene.

After detaining the Defendant, Officer Lujan noticed that he appeared intoxicated. Given the suspected[4] intoxication, Defendant was arrested for driving under the influence ("DWI") in violation of NMSA 1978, § 66-08-102(A). **Doc. 46-1 at 2 & 7**. It is also worth noting that law

---

[3] According to testimony and exhibits from the suppression hearing, as well as the exhibits included in the United States' Response to Defendant's Motion to Suppress (**Doc. 46**), Officer Fernando Jara was the secondary NMSP officer pursuing the SUV. Officer Jara joined up with Officer Lujan in the vehicle chase near Avenida Cesar Chavez.

[4] According to Officer Lujan's testimony at the hearing, Defendant had bloodshot eyes, slurred speech, and smelled of alcohol. *See also* **Doc. 46-1 at 7** (same).

enforcement had probable cause to stop and arrest Defendant for speeding, reckless driving, evading police, and leaving the scene of an accident.

After being arrested, Defendant was read his *Miranda* rights and handcuffed. Shortly thereafter, Defendant was evaluated by EMS personnel and while they determined that Defendant was medically stable, they explained that Defendant needed to be transported to the hospital for further evaluation.

Given the total destruction of the SUV as well as Defendant's arrest, Officer Lujan asked Sergeant Lafave to conduct a tow inventory. During this tow inventory, Sergeant Lafave discovered thousands of dollars in cash and a large quantity of blue pills (suspected fentanyl). Upon seeing the drug contraband, Sergeant Lafave stopped the inventory search, called the NMSP narcotics unit, sealed the vehicle, and waited for a search warrant to be issued.

The warrant was issued the next day, on February 10, 2023. The subsequent search revealed approximately 22,800[5] grams of fentanyl and $130,000 in U.S. currency.

## FOURTH AMENDMENT SEARCHES AND SEIZURES

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (quoting U.S. Const. amend IV). This means the police "generally cannot conduct a search or make a seizure" without a warrant. *United States v. Braxton*, 61 F.4th 830, 833 (10th Cir. 2023) (quoting *United States v. Kendall*, 14 F.4th 1116, 1122 (10th

---

[5] An amount of fentanyl as light as a feather can kill a human. According to the Drug Enforcement Administration, one kilogram has the potential to kill 500,000 people. *See* Press Release, DEA Launches Project Wave to Stop Flood of Deadly Fentanyl (Apr. 27, 2021), available at https://www.dea.gov/press-releases/2021/04/27/dea-launches-project-wave-breaker-stop-flood-deadly-fentanyl-1 [https://perma.cc/8BF9-6Q3A].

Based on available data from the DEA, the approximately 23 kilograms of fentanyl in Defendant's vehicle translates to a lethal dose of fentanyl for approximately 11,000,000 people. For reference, New Mexico has a population of just over 2,000,000. *See* UNITED STATES CENSUS BUREAU, *2020 Census Apportionment Results* (April 26, 2021), https://www2.census.gov/programs-surveys/decennial/2020/data/apportionment/apportionment-2020-table02.pdf [https://perma.cc/PG2C-YEZE].

Cir. 2021)). There are, of course, exceptions to this rule. *See United States v. Venezia*, 995 F.3d 1170, 1174 (10th Cir. 2021) ("In the absence of a warrant, a search is reasonable only if it falls within a specific exception." (quoting *Riley v. California*, 573 U.S. 373, 382 (2014)). But "reasonableness is always the touchstone of Fourth Amendment analysis." *Birchfield v. North Dakota*, 579 U.S. 438, 477 (2016).

Two interrelated exceptions are relevant here. First, is the inventory search. *See Colorado v. Bertine*, 479 U.S. 367 (1987); *see also United States v. Taylor*, 592 F.3d 1104 (10th Cir. 2010). The second is the community-caretaking exception. *See Cady v. Dombrowski*, 413 U.S. 433 (1973); *see also United States v. Chavez*, 985 F.3d 1234 (10th Cir. 2021). These exceptions feed off one another—allowing for the impoundment of a vehicle that is consistent with standardized policy when it is supported by a valid community-caretaking rationale. *See United States v. Sanders*, 796 F.3d 1241, 1243 (10th Cir. 2015).

Also relevant is a brief summary of probable cause. The probable cause standard "requires only a fair probability, a standard understood to mean something more than a bare suspicion but less than a preponderance of the evidence at hand." *United States v. Johnson*, 43 F.4th 1100, 1107 (10th Cir. 2022) (cleaned up). When a traffic stop is based upon probable cause, "considerably more leeway" is afforded to the officer. *Rodriguez v. United States*, 575 U.S. 348, 365 (2015) (Thomas, J., dissenting) (citing *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.")). Moreover, a warrantless search of a vehicle is allowed—incident to arrest—if it is "reasonable to believe that evidence of the offense of arrest" might be found inside. *Arizona v. Gant*, 556 U.S. 332, 335 (2009). As *Gant* makes clear, there are "circumstances unique to the vehicle context."

*Gant*, 556 U.S. at 343. In fact, the offense of arrest may supply a basis for searching an arrestee's vehicle and any containers therein. *Id.* at 344 (first citing *New York v. Belton*, 453 U.S. 454 (1981); then citing *Thorton v. United States*, 541 U.S. 615 (2004)).

In this case, Defendant's arrest for DWI coupled with the crashed SUV either: (1) required NMSP officers to conduct a pre-tow inventory, or (2) allowed NMSP officers to conduct a warrantless search of the vehicle for evidence relevant to the crime of arrest. *United States v. Benard*, 680 F.3d 1206, 1210 (10th Cir. 2012). Either way, Defendant's argument for suppression fails.

## DISCUSSION

In the motion, Defendant asks the Court to exclude all evidence obtained by NMSP officers when they seized and inventoried the SUV (**Doc. 43 at 3–4; Doc. 47 at 1–2**). The United States counters: arguing that the inventory search was proper (**Doc. 46 at 1**). The Court agrees with the United States and finds that the pre-tow inventory was proper—and is dispositive.

Although Defendant's motion could be denied exclusively on this ground, the Court resolves the additional arguments raised by the parties.

The United States argues, in the alternative, that the search and seizure were supported by probable cause (**Doc. 46 at 3**). Once again, the Court agrees. Law enforcement had probable cause to arrest the Defendant—and they also had probable cause to search and seize the SUV because it was evidence of the crime. *See United States v. Maher*, 919 F.2d 1482, 1487 (10th Cir. 1990) (finding that probable cause to seize a trailer without a warrant was reasonable when "the vehicle is itself evidence of crime").

Additionally, the Court rejects Defendant's new argument raised at the suppression hearing—that is, defense counsel's reliance on two recent cases decided by panels of the New

Mexico Court of Appeals. As explained below, decisions from New Mexico's intermediate appellate court do not move the needle in the slightest in this federal case given the plethora of on-point and controlling Tenth Circuit precedent.

## I. The Inventory Search was for a Proper Community-Caretaking Purpose

When law enforcement seizes a vehicle, "a warrantless inventory does not offend Fourth Amendment principles" so long as the purpose is to protect the car and its contents. *Chavez*, 985 F.3d at 1242 (citing *United States v. Lugo*, 978 F.2d 631, 636 (10th Cir. 1992)). And so long as an inventory is conducted "pursuant to standard police procedures," it is reasonable. *South Dakota v. Opperman*, 428 U.S. 364, 372 (1976). Impoundments must be "justified by both a standardized policy and a reasonable, non-pretextual community-caretaking rationale." *Sanders*, 796 F.3d at 1248. Unsurprisingly, one of the major driving forces for impoundment is avoiding liability. *See Taylor*, 592 F.3d at 1108 ("Police may inventory impounded property to avoid liability for missing items."); *see also Bertine*, 479 U.S. at 372. In fact, once officers decide to tow a car, they are required to conduct an inventory in order to "safeguard a Defendant's property." *Taylor*, 592 F.3d at 1108; *see also Braxton*, 61 F.4th at 831 (explaining the safeguarding of property is a valid community-caretaking interest).

In the Tenth Circuit, the pre-impoundment inventory goes part and parcel with assessing the validity of the community-caretaking rationale. *See Sanders*, 796 F.3d at 1243. In that vein, the community-caretaking exception "operates differently depending on the nature of the property from which the vehicle is impounded." *United States v. Ramos*, 88 F.4th 862, 868 (10th Cir. 2023). Vehicles on "streets, roads, and ways" provide greater justification for impoundment because they typically obstruct traffic or create a threat to public safety. *Id.* This is precisely the situation confronting the NMSP officers in the case at bar.

Despite Defendant's argument that the inventory search was "merely a sham," **Doc. 47 at 2**, the facts and law prove otherwise. It seems, according to defense counsel, that law enforcement was required to leave a totally destroyed vehicle in the middle of a four-lane road. Likewise, it seems as though defense counsel is suggesting law enforcement has no obligation to safeguard the Defendant's property. In this alternate universe, NMSP should have left $130,000 in cash and enough fentanyl to kill everyone in the state of New Mexico unchecked, unguarded, and unsecured.[6] Of course, these claims have no grounding in the realities of the law.

For starters, the photographs of the crashed SUV conclusively establish that it was totaled and posed a safety hazard. *Venezia*, 995 F.3d at 1180. It was not "legally parked." *Id.* The SUV was "obstructing traffic." *Id.* And the Defendant was arrested for driving while intoxicated. *See United States v. Johnson*, 734 F.2d 503, 504 (1984). Additionally, the SUV came to rest on public property—which necessarily provides the NMSP officers "far greater authority to impound." *Ramos*, 88 F.4th at 867.

NMSP policy (**Doc. 46-3**) states that a tow is not necessary *if* there is a "reasonable alternative" to towing. In this case, there was no reasonable alternative to towing because the SUV was totally destroyed (**Doc. 46-1 at 8; Doc. 46-3 at 2**). The evidence makes clear that the removal of the SUV "is beyond challenge." *Opperman*, 428 U.S. at 369 ("The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge.").[7] In fact, "promoting the efficient movement of traffic" is an explicitly sanctioned reason supporting impoundment. *Ramos*, 88 F.4th at 867; *see generally Sanders*, 796

---

[6] Fentanyl is the number one cause of death among Americans ages 18 to 45. *See* Fentanyl by Age: Report, Families Against Fentanyl (last visited April 16, 2024), https://www.familiesagainstfentanyl.org/research/byage [https://perma.cc/6K69-WW93].
[7] The Tenth Circuit has repeatedly used this exact quote from *Opperman* to address the constitutionality of inventory searches and vehicle impoundment. *See United States v. Ibarra*, 955 F.2d 1405, 1411 (10th Cir. 1992) (Baldock, J., concurring); *United States v. Martin*, 59 F. App'x 255, 256 (10th Cir. 2003) (unpublished); *Sanders*, 796 F.3d at 1244; *Chavez*, 985 F.3d at 1243; *Trujillo*, 993 F.3d at 865; *Venezia*, 995 F.3d at 1177. This case is no different.

F.3d at 1241; *United States v. Trujillo*, 993 F.3d 859 (10th Cir. 2021). Given that Officer Lujan saw a significant sum of money outside the vehicle in plain view, this further supports the conclusion that the NMSP officers needed to "safeguard the property." **Doc. 46 at 5; Doc. 46-3 at 6**. The Tenth Circuit has made clear that impoundment must be made "pursuant to standard police procedures *and* for the purpose of protecting the car and its contents." *Chavez*, 985 F.3d at 1242 (quoting *Lugo*, 978 F.2d at 636 (cleaned up)). Here, both criteria are met.





**Doc. 46-2 at 4 & 5**. If a picture is worth a thousand words, then these images tell a story. Clearly Defendant's vehicle was totaled. It posed a safety hazard and was obstructing traffic. All these facts weigh heavily in favor of the United States.

But NMSP were not only performing a community-caretaking function by simply towing this impediment. As the testimony made clear, NMSP officers also needed to protect Defendant's property. Conducting an inventory to "safeguard a Defendant's property" is consistent with the other driving force of the community-caretaking rationale. *Taylor*, 592 F.3d at 1108; *Braxton*, 61 F.4th at 831.

Once again, the Court includes photographs from Gov. Ex. 2 to illustrate the scene.





**Doc. 46-2 at 8 & 5**. From the Court's perspective, failing to secure and safeguard the shoe, sunglasses, or several hundred dollars of loose U.S. currency around the vehicle would have been shoddy police work.

At the end of the day, the decision to tow the SUV was reasonable. Candidly, the NMSP officers had no choice.[8] The vehicle was inoperable—so a tow[9] was necessary. And before law enforcement can tow a vehicle, an inventory of its contents is required to safeguard the property.

In sum, the Court finds that: (1) NMSP was required to inventory the SUV, (2) NMSP inventoried the SUV according to their standard operating procedures, (3) the search was reasonable, and (4) the pre-impoundment inventory was made to protect the contents of the SUV. Therefore, because the pre-tow inventory was conducted in accordance with NMSP policy and for a valid "community-caretaking" reason, Defendant's motion to suppress must be **DENIED**.

## II. Alternatively, There Was Probable Cause to Search the SUV

Police may conduct a warrantless search of an automobile so long as there is probable cause to believe "contraband or evidence" is inside a vehicle. *California v. Acevedo*, 500 U.S. 565, 580 (1991). As mentioned in the Government's Response (**Doc. 46 at 3**), the SUV itself was "evidence which is subject to seizure." *United States v. Ludwig*, 10 F.3d 1523, 1528 (10th Cir. 1993); *see also United States v. Vasquez-Castillo*, 258 F.3d 1207, 1212 (10th Cir. 2001) ("Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence.").

The automobile exception fits the facts of this case. When officers have probable cause to believe "an automobile contains contraband, the Fourth Amendment does not require them to

---

[8] The Court is very confident that if the NMSP officers had not ordered the SUV be towed, then the BCSO officers would have done so.

[9] At the suppression hearing, the Court opined that the SUV was totaled and had to get towed. Defense counsel agreed "one hundred percent" with this sentiment. Counsel even agreed there needed to be an inventory search.

obtain a warrant" before seizing or searching. *See United States v. Mercado*, 307 F.3d 1226, 1228 (10th Cir. 2002) (quoting *Florida v. White*, 526 U.S. 559, 563–64 (1999)). Moreover, the warrantless search justification does not dissipate "once the car has been immobilized." *Mercado*, 307 F.3d at 1229. And once law enforcement has made a "lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest" search the vehicle. *United States v. Olguin-Rivera*, 168 F.3d 1203, 1205 (10th Cir. 1999).

Thus, probable cause and the automobile exception allowed for the warrantless search of the SUV for evidence of the multiple state-level offenses. *Mercado*, 307 F.3d at 1228. First, the vehicle itself was evidence (**Doc. 46 at 3**). Second, it is reasonable for an officer to believe open containers[10] of alcohol were inside the SUV. Ultimately, the same information that gave Officer Lujan probable cause to arrest the Defendant also provided probable cause to seize and search the vehicle—namely, evidence of a DWI, speeding, evading, reckless driving, and destruction of property (**Doc. 46 at 3; Doc. 46-1 at 2–3**).

Defendant argues that police lacked probable cause to search his vehicle for drugs and alcohol, and he claims that the inventory search was pretextual for a search for evidence of a crime. But much like the Court in *United States v. Phillips*, 71 F.4th 817 (10th Cir. 2023), this Court also concludes the smell of alcohol "provided a sufficient basis for a probable cause search." *United*

---

[10] Officer Lujan's observations of Defendant's behavior coupled with the odor of alcohol provided a reasonable basis to believe that evidence relevant to his intoxication—*viz.* the means of intoxication such as bottles containing alcohol—might be found in the vehicle. *See United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007) ("Police officers may conduct a warrantless search of a vehicle if they have probable cause to believe that the vehicle contains evidence of a crime."); *United States v. Wimbush*, 337 F.3d 947, 951 (7th Cir. 2003) (finding that plain view or plain smell of alcohol provided probable cause for a warrantless search of the vehicle as "evidence of a crime"); *United States v. Neumann*, 183 F.3d 753, 756 (8th Cir. 1999) (concluding an officer's training and experience coupled with the smell of alcohol on the driver's breath were sufficient to establish "probable cause to search [Defendant's] vehicle for an open container"); *United States v. Malik*, 963 F.3d 1014, 1015–16 (9th Cir. 2020) (finding a DUI provided probable cause to search a vehicle for violations of state law); *United States v. Smith*, 332 F. App'x 876, 878 (11th Cir. 2009) (unpublished) (finding an arrest for DUI where Defendant admitted to having weapons was sufficient to search and seize the vehicle); *Cf. Gant*, 556 U.S. at 346 (permitting an officer to conduct a search of a vehicle when "it is reasonable to believe the vehicle contains evidence of the offense of arrest").

*States v. Phillips*, No. 21-cr-363, 2022 U.S. Dist. LEXIS, at *13 (N.D. Okla. Jan. 13, 2022), *aff'd*, 71 F.4th 817 (10th Cir. 2023). The fact that Officer Lujan asked Sergeant Lafave to conduct a tow inventory "is inconsequential." *Phillips*, 71 F.4th at 824. What matters is whether the facts establish probable cause—and they do. Defendant's commission of traffic violations and the smell of alcohol provided "probable cause to search the vehicle." *Id.* at 819.

In this vein, it is worth examining what facts law enforcement knew. Under the collective knowledge doctrine, the reasonable suspicion or probable cause of one officer can be imputed to another officer. *See United States v. Pickel*, 863 F.3d 1240, 1249 (10th Cir. 2017). Officers Lujan and Jara certainly had probable cause to arrest Defendant for DWI—as well as several other state-level offenses (**Doc. 46-1 at 2–3**). Thus, each officer on scene would have been permitted to conduct either a warrantless search based on probable cause or a pre-impoundment inventory search. Additionally, Officer Lujan's knowledge of Defendant's "probation arrest hold," **Doc. 46-1 at 5**, could have been imputed into the other officers' actions. Officer Lujan's knowledge of the Defendant's ankle monitor and conversation with Defendant's probation officer are also imputed to other officers. *Id.* **at 7**.

Under both state law and federal law, "probationers have a lesser expectation of privacy." *State v. Benavidez*, 2010-NMCA-035, ¶ 11, 148 N.M. 190, 231 P.3d 1132 (N.M. Ct. App. 2010); *United States v. Flaugher*, 805 F.3d 1249, 1250 (10th Cir. 2015) (discussing warrantless searches of probationers). Thus, to the extent Defendant could have been arrested for violating probation (*i.e.*, by way of his DWI), law enforcement necessarily had reasonable suspicion to believe there was contraband or evidence of a violation of his probation in the vehicle. And reasonable suspicion is a "less demanding standard than probable cause." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).

It necessarily holds true, then, that the NMSP officers could have searched Defendant under the lessened standard of reasonable suspicion due to his status as a probationer.

This is true even though Officer Lujan did not communicate all the information. *See United States v. Latorre*, 893 F.3d 744, 753 (10th Cir. 2018). All law enforcement personnel on scene (NMSP and BCSO) were operating "as a team." *United States v. Chavez*, 534 F.3d 1338, 1347 n.13 (10th Cir. 2008). The fact Officer Lujan never communicated Defendant's probation status is "not unusual in vertical collective knowledge cases." *See United States v. Rodriguez-Rodriguez*, 550 F.3d 1223, 1227–28 (10th Cir. 2008).

Defendant's argument attacking probable cause is devoid of merit.

**III. A Warrant Would Have Been Issued**

A search warrant was, in fact, sought and obtained in this case (**Doc. 46 at 6**). *See also* **Doc. 1**, No. 23-MR-344. In this section, the Court contemplates a hypothetical scenario to determine if—under different circumstances—a magistrate judge would have issued a warrant to search the unopened duffle bag.

When law enforcement initially arrived on scene, no steps were taken to initiate the process of obtaining a warrant. Again, that is because they were conducting a valid warrantless inventory. *See supra* ¶ I. At the suppression hearing, however, the parties disagreed about the role inevitable discovery might play as an alternative basis for resolving the suppression motion. Accordingly, the Court has decided to address this argument.

For purposes of analysis and in order to discuss the doctrine of inevitable discovery, the Court assumes there was an illegal search. Under such a scenario, the theory of inevitable discovery means that a warrant would have been obtained but for the illegal search, so the district

court must evaluate the likelihood that a warrant would have been issued and the evidence at issue would have been found. *See United States v. Souza*, 223 F.3d 1197, 1204 (10th Cir. 2000).

Here, it is highly likely that a warrant would have been issued for the duffle bag had the officers applied for one prior to inventorying it. In reaching this conclusion, the Court can rely on hypotheticals. *See United States v. Martinez*, 512 F.3d 1268, 1274 (10th Cir. 2008) (explaining the Government can rely on a hypothetical when proving inevitable discovery).

In this hypothetical, the Court evaluates what the officers knew before opening the duffle bag. So, what exactly did law enforcement know?

First, the officers knew that Defendant possessed a large sum of cash—because there was money visible inside and outside of the wrecked SUV. They knew that Defendant was arrested for DWI after a high-speed chase. Law enforcement also knew of Defendant's probationer status, criminal history, and criminal association (**Doc. 46 at 6; Doc. 18**). This is enough to establish probable cause for a warrant to search the duffle bag.

First, the huge sum of cash in the vehicle is "a powerful indicator of illegal activity . . . of the illegal drug trade." *United States v. Hernandez-Lizardi*, 530 F. App'x 676, 684 (10th Cir. 2013) (unpublished) (citing *United States v. Slater*, 971 F.2d 626, 637 (10th Cir. 1992)). This is particularly true when, as here, the large quantities of cash were "banded." *United States v. $242,484.00 in U.S. Currency*, 389 F.3d 1149, 1161 (11th Cir. 2004) ("A common sense reality of everyday life is that legitimate businesses do not transport large quantities of cash rubber-banded into bundles and stuffed into packages in a backpack."); *see also United States v. $252,300.00 in U.S. Currency*, 484 F.3d 1271, 1275 (10th Cir. 2007) (stating that a large amount of currency "bundled in stacks held by rubber bands" is "strong evidence" of a drug transaction).

Additionally, criminal history—when combined with other factors—can support a finding of probable cause. *See United States v. Artez*, 389 F.3d 1106, 1114 (10th Cir. 2004) (citation omitted). Much the same, Defendant's flight (when combined with other factors) also provides for probable cause. *United States v. Cruz*, 977 F.3d 998, 1005 (10th Cir. 2020) (noting flight is a factor in probable cause analysis).

Here, the officers had "strong probable cause" to obtain a search warrant—even though no steps to obtain a warrant were taken prior to the inventory. *United States v. Streett*, 83 F.4th 842, 849 (10th Cir. 2023). The *Souza* factors make this conclusion abundantly clear. As detailed, "the showing of probable cause" is strong. *Souza*, 223 F.3d at 1204 (citation omitted). The Defendant fled from law enforcement, had a known criminal history, known probation status, and was in possession of a large sum of cash. And, as discussed, a warrant was ultimately obtained (albeit after the alleged illegal[11] entry). *Id.* Finally, neither the first nor last *Souza* factor favor Defendant given that the inventory search was a valid exception to the warrant requirement—so law enforcement did not "jump the gun." *Id.* (cleaned up).

In the context of a vehicle search, "if evidence seized unlawfully would have been inevitably discovered in a subsequent inventory search, such evidence would be admissible." *United States v. Blaze*, 143 F.3d 585, 593 (10th Cir. 1998). Thus, any discussion herein about inevitable discovery is merely an alternative holding the Court analyzed because defense counsel is unpersuaded by circuit precedent on this issue. So instead, the Court created a hypothetical. A hypothetical, wherein, the Court concludes the fentanyl was subject to inevitable discovery.

As the Government argued at the suppression hearing, a search warrant would have been issued. The Court agreed then; and the Court agrees now.

---

[11] Once again, the Court notes that the inventory was not an illegal search. For the sake of argument, however, the Court presumes the inventory of the duffle bag was an illegal entry.

**IV. Meaningless Citations to the New Mexico Court of Appeals**

At the suppression hearing, defense counsel cited to two New Mexico Court of Appeals cases that held inventory searches of closed containers violate Article II, Section 10 of the New Mexico Constitution. *See generally State v. Jim*, 2022-NMCA-022, 508 P.3d 937 (N.M. Ct. App. 2022); *State v. Sanders*, 2024-NMCA-030 (N.M. Ct. App. 2024).

As the Court commented during argument at the suppression hearing, when one walks into the federal courthouse in downtown Albuquerque, one cannot miss the large lettering over the front doors that reads, in part, "**UNITED STATES COURTHOUSE**."

So why did defense counsel stray from the arguments in their pleading and instead focus on two state-level appellate cases? According to defense counsel, because the standard NMSP procedures in effect in 2023 were determined to violate the New Mexico Constitution based on the two above-referenced New Mexico Court of Appeals cases, Officer Lujan's and Sergeant Lafave's reliance on the written procedures during the February 9, 2023, tow inventory was unreasonable. The Court is not persuaded.

While this Court acknowledges that the two New Mexico Court of Appeals opinions are based solely on state law, the Court nevertheless is of the view that the legal reasoning in the two opinions is flawed. For starters, both cases explicitly depart from federal jurisprudence. In *Jim*, the New Mexico Court of Appeals determined the "Fourth Amendment does not prohibit the opening of a locked container during an automobile inventory search." *Jim*, 2022-NMCA-022, ¶ 8. Instead, the case was decided under "Article II, Section 10" of the New Mexico Constitution—which "provides greater protection[s]." *Id.* at ¶ 13. The *Sanders* Court was equally as forthcoming—as the New Mexico Court of Appeals once again noted that their decision "departs from Federal jurisprudence." *Sanders*, 2024-NMCA-030, at ¶ 14.

19

But these Court of Appeals cases also depart from the New Mexico Supreme Court in their conclusion that inventorying containers is unreasonable. Unlike the Court of Appeals in *Jim* and *Sanders*, the New Mexico Supreme Court explicitly found searches of containers reasonable. *See e.g., State v. Boswell*, 1991-NMSC-004, 111 N.M. 240, 804 P.2d 1059 (N.M. 1991); *State v. Davis*, 2018-NMSC-001, ¶ 23, 408 P.3d 576 (N.M. 2017); *State v. Ortiz*, 2023-NMSC-026, 539 P.3d 262 (N.M. 2023). In these cases, the New Mexico Supreme Court explained that inventory searches hinge on reasonableness—and listed three different situations where such searches are reasonable. The three justifications are (1) to protect the arrestee's property in police custody; (2) to protect the police against claims or disputes over lost or stolen property; or (3) to protect the police from potential danger. This Court focuses on the last justification.

In *Jim* and *Sanders*, the New Mexico Court of Appeals weighed the governmental interest (*i.e.*, the three legitimate governmental purposes stated above) against the intrusion on citizen's privacy interests. But the Court of Appeals did not consider the justification of protecting the police from potential danger. In fact, the Court dismisses its previous language noting that inventory searches protect from "hidden dangers." *State v. Shaw*, 1993-NMCA-016, ¶ 15, 115 N.M. 174, 848 P.2d 1101 (N.M. Ct. App. 1993); *State v. Garcia*, 2014 N.M. App. Unpub. LEXIS 3, ¶ 5 (N.M. Ct. App. Jan. 6, 2014) (unpublished). The *Jim* and *Sanders* cases also disregard the same "hidden danger" language employed by the Supreme Court. *Boswell*, 1991-NMSC-004, ¶ 14.

The undersigned believes some discussion on this "danger" issue is warranted to demonstrate the flawed reasoning of these two New Mexico Court of Appeals opinions. It is baffling to this Court that protecting the arrestee, the police, other inmates, or other persons and property in and around the police station—or on-scene—from an unknown harm does not qualify as "in furtherance of" a valid governmental purpose. In this Court's view, the *Jim* and *Sanders*

cases create a chicken-or-egg problem. Without knowing what is in a bag or container, how can law enforcement seek to protect themselves or innocent members of the public? According to these decisions, someone seeking to create a mass casualty event need only hide their bomb in a bag— at which point the New Mexico Constitution provides an impenetrable layer of protection. Surely the New Mexico Constitution does not stand for such a proposition.

Some other examples merit discussion. What if the duffle bag at issue here contained anthrax instead of fentanyl? Or maybe, instead, it contained a homemade explosive device? How can the police take something into custody without knowing what it is? *See Illinois v. Lafayette*, 462 U.S. 640, 646-47 (1983) ("A range of governmental interests supports an inventory process . . . Dangerous instrumentalities—such as razor blades, bombs, or weapons—can be concealed in innocent-looking articles . . .. [and] the bare recital of these mundane realities justifies reasonable measures by police to limit these risks."). This is the issue that the New Mexico Court of Appeals overlooks.

Taking the *Jim* and *Sanders* cases to their logical end also begs the question, what is a container? Jackets and pants typically have pockets. So in the Court of Appeals' crusade to provide every New Mexico citizen with an "extra layer of protection," *Jim*, 2022-NMCA-022 at ¶ 23, from unreasonable searches, are warrantless regulatory security screenings at courthouse entrances prohibited? Of course not.

"[O]rderly police administration justifies examination and inventorying of items removed from an arrestee's possession or person." *Boswell*, 1991-NMSC-004, ¶ 10. This Court imagines that when the New Mexico Supreme Court decides to hear its next "container inventory" case, it will remind the New Mexico Court of Appeals, once again, that "these broad pronouncements are inconsistent with the legal principles that govern here." *Davis*, 2018-NMSC-001, ¶ 23.

Tellingly, the United States Supreme Court has explained that the determination of whether there has been an unreasonable search or seizure is "one of *federal* law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed." *Elkins v. United States*, 364 U.S. 206, 224 (1960) (emphasis added); *see also Olmstead v. United States*, 277 U.S. 438 (1928); *Preston v. United States*, 376 U.S. 364, 366 (1964) ("The question whether evidence obtained by state officers and used against a defendant in a federal trial was obtained by unreasonable search and seizure is to be judged as if the search and seizure had been made by federal officers."); *United States v. Garcia*, 707 F.3d 1190, 1195 (10th Cir. 2013) (explaining "whether the search is authorized by a state . . . may be relevant . . . it cannot rule the day; the primary focus of our inquiry is always federal law").

Unsurprisingly, every federal court of appeals agrees—state law plays no role in assessing the constitutional reasonableness of a Fourth Amendment search or seizure. *See United States v. Richardson*, 86 F.3d 1537, 1544 (10th Cir. 1996) ("In determining the reasonableness of a state search or seizure under the Fourth Amendment, we conduct an independent inquiry and apply federal law."); *United States v. Sawyer*, 441 F.3d 890, 899 (10th Cir. 2006) ("[F]ederal courts must apply federal standards in determining the admissibility of evidence obtained by state law enforcement officers."); *see also United States v. Quinones*, 758 F.2d 40, 43 (1st Cir. 1985); *United States v. Pforzheimer*, 826 F.2d 200, 203–04 (2d Cir. 1987); *United States v. Shaffer*, 520 F.2d 1369, 1372 (3d Cir. 1975); *United States v. Van Metre*, 150 F.3d 339, 347 (4th Cir. 1998); *United States v. Eastland*, 989 F.2d 760, 765 (5th Cir. 1993); *United States v. Combs*, 672 F.2d 574, 578 (6th Cir. 1982); *United States v. Infelice*, 506 F.2d 1358, 1365 (7th Cir. 1974); *United States v. Bell*, 54 F.3d 502, 504 (8th Cir. 1995); *United States v. Becerra-Garcia*, 397 F.3d 1167, 1174 (9th Cir. 2005); *United States v. Butera*, 677 F.2d 1376, 1380 (11th Cir. 1982).

Finally, it is worth noting that the exclusionary rule is a judicially created remedy for federal constitutional violations. *See Davis v. United States*, 564 U.S. 229, 238 (2011) (acknowledging the "exclusionary rule" is a "judicially created remedy"); *United States v. McCane*, 573 F.3d 1037, 1042 (10th Cir. 2009) ("[T]he judicially created exclusionary rule . . . excludes evidence obtained in violation of the Fourth Amendment."). Despite hoping otherwise, defense counsel must be aware that the rule of exclusion does not protect against alleged violations of state constitutional rights. As a matter of law, this Court has no authority or ability to craft a remedy for an alleged state constitutional violation in a federal prosecution.

At its core, defense counsel's reliance on the two New Mexico Court of Appeals cases is misplaced. Those opinions are not persuasive in the slightest. First, federal law informs this Court's analysis—not state law; second, the New Mexico Court of Appeals decisions ***explicitly*** depart from federal jurisprudence; third, the New Mexico Court of Appeals decisions depart from New Mexico Supreme Court jurisprudence; and fourth, the judicially created remedy of exclusion only safeguards against Fourth Amendment violations.

In the case at bar, the NMSP conducted the warrantless inventory search pursuant to standard police procedures. And the procedures (**Doc. 46-3**) comply with the Fourth Amendment. Thus, any discontent about how the procedures conflict with the New Mexico Constitution or New Mexico Court of Appeals decisions has absolutely no bearing on this case. Especially so, given that when an inventory search is conducted pursuant to departmental policy, an inventory search is only unconstitutional if the officers acted in bad faith (*i.e.*, for the sole purpose of investigating). *See Bertine*, 479 U.S. at 371. Consequently, the arguments put forth by Defendant regarding state constitutional law issues are of no consequence and warrant no relief.

## CONCLUSION

This case is emblematic of when law enforcement can (and must) conduct an inventory search prior to towing a vehicle—as the NMSP officers were exercising a legitimate community-caretaking purpose. But even if law enforcement searched and seized the vehicle based on probable cause, the Court finds this course of action would have been proper.

The Court rejects all of Defendant's asserted bases for invalidating the seizure, search, inventory search, or otherwise, and **DENIES** the Motion to Suppress (**Doc. 43**).

**IT IS SO ORDERED**.


       **/s/**
**WILLIAM P. JOHNSON**
**CHIEF UNITED STATES DISTRICT JUDGE**